# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | |
|---|---|
| ROBERT REESE, derivatively on behalf of Nominal Defendant LOCKHEED MARTIN CORPORATION, <br><br> c/o Glancy Prongay Wolke & Rotter LLP <br> 745 Fifth Avenue, Fifth Floor <br> New York, NY 10151 <br><br>         Plaintiff, <br><br>        v. <br><br> JAMES D. TAICLET <br> c/o Lockheed Martin Corporation <br> 6801 Rockledge Drive <br> Bethesda, MD 20817 <br><br> and, <br><br> JESUS MALAVE <br> c/o Lockheed Martin Corporation <br> 6801 Rockledge Drive <br> Bethesda, MD 20817 <br><br> and, <br><br> THOMAS J. FALK <br> c/o Lockheed Martin Corporation <br> 6801 Rockledge Drive <br> Bethesda, MD 20817 <br><br> and <br><br> JOHN C. AQUILINO <br> c/o Lockheed Martin Corporation <br> 6801 Rockledge Drive <br> Bethesda, MD 20817 <br><br> and <br><br> DAVID B. BURRITT <br> c/o Lockheed Martin Corporation <br> 6801 Rockledge Drive <br> Bethesda, MD 20817 | Case No. <br><br><br> **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

and,

JOHN M. DONOVAN
c/o Lockheed Martin Corporation
6801 Rockledge Drive
Bethesda, MD 20817

and,

VICKI A. HOLLUB
c/o Lockheed Martin Corporation
6801 Rockledge Drive
Bethesda, MD 20817

and,

DEBRA L. REED-KLAGES
c/o Lockheed Martin Corporation
6801 Rockledge Drive
Bethesda, MD 20817

and,

HEATHER A. WILSON
c/o Lockheed Martin Corporation
6801 Rockledge Drive
Bethesda, MD 20817

and,

PATRICIA E. YARRINGTON
c/o Lockheed Martin Corporation
6801 Rockledge Drive
Bethesda, MD 20817

and,

JOSEPH F. DUNFORD, JR.
c/o Lockheed Martin Corporation
6801 Rockledge Drive
Bethesda, MD 20817

and,

BRUCE A. CARLSON
c/o Lockheed Martin Corporation
6801 Rockledge Drive
Bethesda, MD 20817

and,

JEH C. JOHNSON
c/o Lockheed Martin Corporation
6801 Rockledge Drive
Bethesda, MD 20817

and,

ILENE S. GORDON
c/o Lockheed Martin Corporation
6801 Rockledge Drive
Bethesda, MD 20817

and,

JAMES O. ELLIS JR.,
c/o Lockheed Martin Corporation
6801 Rockledge Drive
Bethesda, MD 20817

     Defendants,

    and

LOCKHEED MARTIN CORPORATION,
6801 Rockledge Drive
Bethesda, MD 20817

    Serve on:
    CSC-Lawyers Incorporating Service Co.
    7 St. Paul St., Suite 1660
    Baltimore, MD 21202

      Nominal Defendant.

Plaintiff Robert Reese ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Lockheed Martin Corporation ("Lockheed" or the "Company"), against certain current and former executives and members of its Board of Directors (the "Board"), seeking to remedy defendants' breaches of fiduciary duties. Plaintiff's allegations are based on personal knowledge as to himself and his own acts, and as to all other matters upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by Lockheed with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## I.    NATURE AND SUMMARY OF THE ACTION

1.    Lockheed is an aerospace and defense company principally engaged in the research, design, development, manufacture, integration and sustainment of advanced technology systems, products, and services. It has four business segments: aeronautics, missiles and fire control ("MFC"), rotary and mission systems ("RMS"), and space.

2.    The Company is awarded government defense contracts through a bidding process where Lockheed submits a proposal of expected costs and/or pricing. Contractors who submit underpriced bids run the risk that they will bear the costs that exceed those estimates, which will then reduce profitability.

3.    The Individual Defendants (defined herein) claimed that Lockheed had visibility into its profitability and was disciplined in its bids to "match[] the pricing and the risk profile."

4.    However, unbeknownst to stockholders, the Company had submitted proposals under a "must win" strategy that underestimated costs, thereby presenting a risk to profitability.

5.  On October 22, 2024, before the market opened, Lockheed announced $80 million in losses for a classified Aeronautics program "due to higher than anticipated costs to achieve program objectives." The Company also announced it had recognized a reach-forward loss in its RMS segment "as a result of additional quantity ordering risk identified on fixed-price options." On this news, the Company's share price fell 6% to close at $576.98 per share. The statements on October 22, 2024 revealed certain losses, but they were still materially false and misleading because they implied that the losses had been largely contained.

6.  On January 28, 2025, before the market opened, Lockheed revealed **$1.7 billion** in pre-tax losses associated with classified programs at its Aeronautics and Missiles and Fire Control segments. The Company explained that "as a result of performance trends" and "in contemplation of near-term program milestones," it had "performed a comprehensive review of the program requirements, technical complexities, schedule, and risks" based on which it recognized $555 million of losses in its Aeronautics program. The Company further reported additional losses of approximately $1.3 billion in its Mission and Fire Control business due to, among other things, the "future requirements of the program, discussions with the customer and suppliers." As a result, the Company's net earnings in 2024 were $5.3 billion, compared to $6.9 billion in 2023. On this news, the Company's share price fell 9% to close at $457.45 per share on January 28, 2025. These statements implied that Lockheed had taken stock of its contracts, especially those in the Aeronautics segment, and corrected its estimates of costs based on existing trends.

7.  Then, on July 22, 2025, before the market opened, Lockheed disclosed an additional **$1.6 billion** in pre-tax losses on classified programs. This included a $950 million loss related to its Aeronautics classified program due to "design, integration, and test challenges, as well as other performance issues." As a result, the Company reported sharply lower net earnings

2

of $342 million. On this news, the Company's share price fell 10.8% to close at $410.74 per share on July 22, 2025.

8.      The misleading statements concealed the inevitability of reach-forward losses on classified programs. While the inevitability of the losses was concealed from the public and known to insiders and the Board, the Board took steps to protect the Company's executives' incentive compensation awards from reduction due to future losses, while simultaneously issuing millions in incentive compensation on the basis of financial results that it knew would eventually be offset by the losses and on the basis of a Total Stockholder Return metric that was inflated due to the stock price inflation caused by the misstatements. Demonstrating that the Board knew the losses were coming, in February 2023, the Compensation Committee amended certain executive incentive awards, identifying "a specific strategic program approved by the Compensation Committee" and neutralizing the impact of "the timing or recognition of a loss" on that program. Notwithstanding that knowledge, the Compensation Committee certified a 126% annual incentive payout factor for 2023 and a 120.2% long-term incentive payout factor for the 2022-2024 cycle, including a 164.3% Total Stockholder Return Payout Factor driven by the stock price the Board knew was artificially inflated by the concealment of the inevitable losses.

9.      Contemporaneously, and further benefiting the Company's insiders at the expense of the corporation, the Board caused Lockheed to repurchase approximately $4.95 billion of its own common stock at prices inflated by the misleading statements, including approximately $950 million of repurchases at average prices above $530 per share in the weeks following the October 22, 2024 partial disclosure, contemporaneous with the Board's $3.0 billion expansion of the share repurchase program. By the time of the July 22, 2025 disclosure, the stock had fallen to $410.74 per share, well below the prices paid throughout the buyback period.

10.     These revelations precipitated the filing of a securities class action against the Company and certain of the defendants named herein, captioned *Khan v. Lockheed Martin Corporation, et al.*, Case No. 1:25-cv-06197 (S.D.N.Y.) (the "Securities Class Action").

11.     For these reasons and as set forth in greater detail herein, including the Board's refusal to investigate these matters, Plaintiff now files this action against the Individual Defendants who abandoned their fiduciary duties and should now be held accountable for the financial and reputational harm suffered by Lockheed and its shareholders.

## II.    JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question: violations of Section 10(b) of the Exchange Act.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

13.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

14.     In connection with the acts, conduct, and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

15.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

16.     This Court has personal jurisdiction over each Defendant named herein because each Defendant is either a corporation that conducts business in and is headquartered in this District or is an individual who has sufficient minimum contacts with this District to render the

4

exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

17.     Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391 because Defendants have conducted business in this District, and a substantial portion of the transaction and wrongs complained of herein occurred in this District.

### III.    PARTIES

18.     Plaintiff is a beneficial owner of 200 shares of Lockheed common stock.

19.     Nominal Defendant Lockheed is a Maryland corporation with its principal executive offices located at 6801 Rockledge Drive, Bethesda, MD 20817. The Company's common stock trades on the New York Stock Exchange ("NYSE") under the symbol "LMT."

20.     Defendant James D. Taiclet ("Taiclet") has been Lockheed's CEO and President since 2020 and Chairman of the Board since March 2021.

21.     Defendant Jesus Malave ("Malave") was Lockheed's CFO from January 2022 to April 17, 2025.

22.     Defendant Thomas J. Falk ("Falk") is Lockheed's Lead Independent Director and has been a director since 2010. He was Chair of the Audit Committee and a member of the Management Development and Compensation Committee ("Compensation Committee") until May 2024.

23.     Defendant John C. Aquilino ("Aquilino") has been a director of Lockheed since December 2024. He serves as a member of the Classified Business and Security Committee (the "CBS Committee").

24.     Defendant David B. Burritt ("Burritt") has been a director of Lockheed since 2008. He is a member of the Audit Committee, and he has been a member of the Compensation Committee since May 2024.

25.     Defendant John M. Donovan ("Donovan") has been a director since 2021. He serves as a member of the CBS Committee, and he became Chair of the Compensation Committee in 2023.

26.     Defendant Vicki A. Hollub ("Hollub") has been a director of Lockheed since 2018. She is a member of the Compensation Committee, and she has been a member of the Audit Committee since May 2024.

27.     Defendant Debra L. Reed-Klages ("Reed-Klages") has been a director of Lockheed since 2019. She is a member of the Compensation Committee.

28.     Defendant Heather A. Wilson ("Wilson") has been a director of Lockheed since May 2024. She is a member of the CBS Committee.

29.     Defendant Patricia E. Yarrington ("Yarrington") has been a director of Lockheed since 2021. She is a member of the CBS Committee and has been Chair of the Audit Committee since May 2024. She was a member of the Compensation Committee until May 2024.

30.     Defendant Joseph F. Dunford, Jr. ("Dunford") was a director of Lockheed from 2020 to the May 2026 annual stockholder meeting. During his tenure, he served as Chair of the CBS Committee.

31.     Defendant Bruce A. Carlson ("Carlson") was a director of Lockheed from 2015 to May 2025. During his tenure, he served as a member of the CBS Committee.

32.     Defendant Jeh C. Johnson ("Johnson") was a director of Lockheed from 2018 to November 2024. During his tenure, he served as a member of the CBS Committee.

33.     Defendant Ilene S. Gordon ("Gordon") was a director of Lockheed from 2016 to May 2024. She served as a member of the Audit and Compensation Committees.

6

34.     Defendant James O. Ellis Jr. ("Ellis") was a director of Lockheed from 2004 to May 2024. He was a member of the Audit Committee.

35.     Defendants Taiclet, Malave, Falk, Aquilino, Burritt, Donovan, Hollub, Reed-Klages, Wilson, Yarrington, Dunford, Carlson, Johnson, Gordon, and Ellis are sometimes referred to herein as the "Individual Defendants."

## IV.     DUTIES OF THE INDIVIDUAL DEFENDANTS

### A.     Fiduciary Duties

36.     By reason of their positions as officers, directors, and/or fiduciaries of Lockheed and because of their ability to control the business and corporate affairs of Lockheed, at all relevant times, the Individual Defendants owed Lockheed and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage Lockheed in a fair, just, honest, and equitable manner. The Individual Defendants were required to act in furtherance of the best interests of Lockheed and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interests or benefit. Each director and officer of the Company owes to Lockheed and its shareholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

37.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Lockheed, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with Lockheed, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

38.     To discharge their duties, the officers and directors of Lockheed were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls

7

of the Company. By virtue of such duties, the officers and directors of Lockheed were required to, among other things:

(a) Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

(b) Exercise good faith to ensure that the Company operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

(c) Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

(d) When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

**B.   Classified Business and Security Committee**

39.   The CBS Committee charter provides that the purpose of the committee is to oversee Lockheed's "classified business activities and the security of personnel, data, and facilities." This includes review of "the policies and practices with respect to risk assessment and risk management and the internal control environment in the area of classified business activities, including discussing with management any major financial risk exposures and the steps that have been taken to monitor and control such exposure[.]" The committee must also "review the strategic, operational and financial aspects of classified business with the Corporation's management."

40.   Though one member of the Audit Committee must also serve on the CBS Committee, the charter provides that "it is not the responsibility of the CBS Committee to plan or conduct audits or to determine that the Corporation's financial statements, as they relate to

8

classified business activities, security issues or security breaches, are complete and accurate and are in accordance with accounting principles generally accepted in the United States."

41.     Thus, the CBS Committee was responsible for risk oversight over classified business activities. After every committee meeting, the CBS Committee must report to the Board.

**C.     Audit Committee**

42.     The Audit Committee charter provides that the purpose of the committee is to oversee "integrity of the Corporation's financial statements" and "the qualifications, independence and performance of the Corporation's independent auditors."

43.     As to financial matters, the Audit Committee must review "any analyses prepared by management and/or the independent auditors setting forth significant accounting and financial reporting issues and judgments made in connection with the preparation of the financial statements[.]" Moreover, the committee must "Discuss with the Corporation's management the type and presentation of information included in the Corporation's earnings press releases, as well as financial information and earnings outlook provided to the public, analysts and rating agencies."

**D.     Compensation Committee**

44.     The Compensation Committee reviews and approves the corporate goals and objectives relevant to the compensation of the Company's chief executive officer and other executive officers, evaluates the performance of the chief executive officer in view of those goals, and determines and approves the compensation philosophy and levels for the chief executive officer and other executive officers.

45.     Each year, the Compensation Committee establishes the financial and operational performance goals applicable to the executive incentive compensation programs, sets the relative weighting of those metrics, and after the close of each performance period certifies the achieved results and approves the corresponding payouts to the Company's executive officers. The

Compensation Committee also approves amendments to outstanding incentive awards that adjust the metrics by which executive compensation is measured.

46.    The Compensation Committee administers the Company's mandatory clawback policy adopted pursuant to Section 10D of the Securities Exchange Act of 1934 and the NYSE listing standards, and the Company's supplemental discretionary clawback policy set forth in the Company's Governance Guidelines, which authorizes the Board to recover incentive compensation paid to officers whose intentional misconduct or gross negligence causes severe reputational or financial harm to the Company.

47.    During fiscal year 2023, the Compensation Committee was chaired by defendant Donovan and included as members defendants Falk, Gordon, Hollub, Reed-Klages, and Yarrington. During fiscal year 2024, the Compensation Committee remained chaired by defendant Donovan; following the 2024 annual stockholder meeting, defendants Burritt and Hollub continued as members along with defendant Reed-Klages, and defendants Falk and Yarrington rotated off, and defendant Gordon was no longer a director. Throughout fiscal year 2025 and continuing through the date of this Complaint, the Compensation Committee has been chaired by defendant Donovan and has included as members defendants Burritt, Hollub, and Reed-Klages.

## V.    SUBSTANTIVE ALLEGATIONS

### A.    Background

48.    Lockheed is an aerospace and defense company principally engaged in the research, design, development, manufacture, integration and sustainment of advanced technology systems, products, and services. It has four business segments: aeronautics, missiles and fire control ("MFC"), rotary and mission systems ("RMS"), and space.

49.    Its two largest segments are: (i) Aeronautics, which develops and manufactures advanced military aircraft; and (ii) RMS, which develops military and commercial helicopters,

missile defense systems, radar systems, and command and control mission solutions. Aeronautics accounts for about 40% of net sales and of operating profit, and RMS accounts for approximately 25% of net sales and 25-30% of operating profit.

50.     Government defense contracts are awarded by the Defense Department through a bidding process where contractors like Lockheed submit proposals of the expected costs and/or pricing. Either the government reimburses the contractor for certain costs (i.e. cost-plus contracts) or the government pays a fixed price and the contractor bears the risk of cost overruns (i.e. fixed-price contracts). To ensure a win, contractors can submit aggressively underpriced bids, which increases the risk that the contractor will bear cost overruns and reduce its profitability. Thus, contractors must closely monitor financial data, including the costs incurred and the estimated costs for outstanding work, to assess the risk of losses from fixed-price contracts.

51.     Three programs are relevant to this action. *First*, a classified MFC program (whose nature is not publicly disclosed) was originally awarded as a "cost-reimbursable base contract for the initial phase of the program and multiple fixed-price options for additional phases." It became a fixed-price contract sometime in 2024. *Second*, a classified Aeronautics program was originally awarded as a fixed-price incentive fee contract for the initial phase, but the additional phases were on cost-plus terms.

52.     *Third*, Lockheed is the prime contractor for the military's F-35 aircraft, which represented 26% of the Company's total revenues in 2023. F-35 contracts aware awarded based on successive production blocks (called "Lots") to produce aircraft according to a specific hardware and software configuration. In 2022, the Defense Department approved the next phase of F-35 aircraft with new technological capabilities called TR-3, and all F-35 aircraft must

11

incorporate TR-3. Lockheed was awarded advance acquisition authorization for Lot 18 and 19, allowing the Company to begin work and incur costs before the contract is formally awarded.

## B.    The Individual Defendants Issued Materially Misleading Statements

53.    On January 23, 2024, Lockheed filed its fiscal 2024 annual report with the SEC, which was signed by officers Taiclet and Malave and by the entire Board. Therein, Lockheed stated that it estimates the sales and costs of completion for long-term contracts at the outset, stating in relevant part:

> Significant estimates and assumptions are made in estimating contract sales, costs, and profit. We estimate profit as the difference between estimated revenues and total estimated costs to complete the contract. At the outset of a long-term contract, we identify and monitor risks to the achievement of the technical, schedule and cost aspects of the contract, as well as our ability to earn variable consideration, and assess the effects of those risks on our estimates of sales and total costs to complete the contract. ***The estimates consider the technical requirements (e.g., a newly developed product versus a mature product), the schedule and associated tasks (e.g., the number and type of milestone events) and costs (e.g., material, labor, subcontractor, overhead, general and administrative and the estimated costs to fulfill our industrial cooperation agreements, sometimes referred to as offset or localization agreements, required under certain contracts with international customers).*** The initial profit booking rate of each contract considers risks surrounding the ability to achieve the technical requirements, schedule and costs in the initial estimated total costs to complete the contract. Profit booking rates may increase during the performance of the contract if we successfully retire risks related to technical, schedule and cost aspects of the contract, which decreases the estimated total costs to complete the contract or may increase the variable consideration we expect to receive on the contract. Conversely, our profit booking rates may decrease if the estimated total costs to complete the contract increase or our estimates of variable consideration we expect to receive decrease. All of the estimates are subject to change during the performance of the contract and may affect the profit booking rate. ***When estimates of total costs to be incurred on a contract exceed total estimates of the transaction price, a provision for the entire loss is determined at the contract level and is recorded in the period in which the loss is evident, which we refer to as a reach-forward loss.***

> Comparability of our segment sales, operating profit and operating margin may be impacted favorably or unfavorably by changes in profit booking rates on our contracts. Increases in the profit booking rates, typically referred to as favorable profit booking rate adjustments, usually relate to revisions in the estimated total costs to fulfill the performance obligations that reflect improved conditions on a particular contract. Conversely, conditions on a particular contract may deteriorate,

12

resulting in an increase in the estimated total costs to fulfill the performance obligations and a reduction in the profit booking rate and are typically referred to as unfavorable profit booking rate adjustments. ***Increases or decreases in profit booking rates are recognized in the period they are determined and reflect the inception-to-date effect of such changes.***

54.     That same day, the Company held a conference call for the release of its fourth quarter 2023 financial results. During the call, analysts inquired about the risks for its current contracts. Defendant Malave replied:

> The other thing that we're – just to talk about what we're thinking about contractually, and Jim has really led the way here, is that ***we just are employing a lot more pricing discipline than we have more recently.*** And we're looking at things and ensuring that it's just a more analytical support for the way we approach pricing, that we capture any types of technological advantages that we may have. ***Also, as we make an assessment of risk, the contracting vehicles appropriate to that risk, but that our pricing accounts for that risk as well. And so that's the way we've been approaching things for really this year going into 2024***, and I'll hand it over to Jim.

55.     In response to the same question, defendant Taiclet continued that Lockheed was "really matching the pricing and the risk profile" and that "we don't have any must-win programs at Lockheed Martin anymore."

56.     During the same fourth quarter 2023 earnings call, an analyst asked about the margin impact of the classified MFC program, and defendant Malave responded: "In general, across all of Lockheed Martin, . . . we're just keeping a tight lid on overhead and indirect costs and streamlining that cost structure where the opportunities exist."

57.     On February 14, 2024, defendant Malave participated on behalf of Lockheed at the TD Cowen Aerospace & Defense Conference where he was asked about programs in the "watch category." He stated that the classified Aeronautics program, "which has fixed-price development to it, that's always a watch item for us." He claimed that "we continue to monitor that one pretty closely" and there is a "***possibility*** that a risk can surface there because it is fixed-price development."

13

58.     The foregoing statements were materially false and/or misleading because they implied that Lockheed had adequate processes to assess financial risks in its contracts and adequate risk management procedures, while omitting to disclose that the Company had underestimated the costs necessary for certain classified business contracts. As a result, stockholders had a misleading impression about the risks to profitability for its contracts.

59.     On July 23, 2024, Lockheed held a conference call in connection with its second quarter 2024 financial results. During the call, defendant Taiclet claimed that Lockheed expected "deliveries of the F-35 aircraft to exceed production for the next few years." And defendant Malave represented that the Company "expect[s] F-35 Lot 18 and 19 to be awarded this year, maintaining program funding, and continuity."

60.     The foregoing statements about the F-35 program were materially false and/or misleading because they omitted to disclose the operational and cost issues caused by the TR-3 upgrade and the resulting delay to negotiations for the Lot 18 and 19 contract, which would delay funding and cause material financial harm.

**C.      The Truth Begins To Emerge**

61.     On October 22, 2024, before the market opened, Lockheed announced $80 million in losses for a classified Aeronautics program "due to higher than anticipated costs to achieve program objectives." The Company also announced it had recognized a reach-forward loss in its RMS segment "as a result of additional quantity ordering risk identified on fixed-price options." On this news, the Company's share price fell 6% to close at $576.98 per share.

62.     The same day, Lockheed held a conference call in connection with its third quarter 2024 financial results. During the call, analysts asked about the performance of the classified MFC program. Defendant Malave stated that "[a]s far as 2025, a baseline assumption would be that we

14

– you go from $325 million to anywhere between, say, $250 million to $300 million in losses in 2025, assuming a one-per-year type of framework."

63.    The statements on October 22, 2024 revealed certain losses, but they were still materially false and misleading because they implied that the losses had been largely contained.

64.    On January 28, 2025, before the market opened, Lockheed revealed ***$1.7 billion*** in pre-tax losses associated with classified programs at its Aeronautics and Missiles and Fire Control segments. The Company explained that "as a result of performance trends" and "in contemplation of near-term program milestones," it had "performed a comprehensive review of the program requirements, technical complexities, schedule, and risks" based on which it recognized $555 million of losses in its Aeronautics program. The Company further reported additional losses of approximately $1.3 billion in its Mission and Fire Control business due to, among other things, the "future requirements of the program, discussions with the customer and suppliers." As a result, the Company's net earnings in 2024 were $5.3 billion, compared to $6.9 billion in 2023. On this news, the Company's share price fell 9% to close at $457.45 per share on January 28, 2025.

65.    During the conference call held in connection with the fourth quarter and full year 2024 financial results, defendant Taiclet explained that the charges related to contracts entered under "must win" competitions but that the Company's model now had a "stringent risk adjusted ROI regime" to balance aggressive bids with achieving positive results. Importantly, he stated that "[r]ecording charges in Q4 on these two programs enabled us to de-risk the financial profile of both these critical national security programs going forward as we move into their next phases." He continued:

> While these particular contracts were struck a number of years ago, there are no longer any must-win competitions. Under today's Lockheed Martin wide bid process, every proposal adheres to a stringent, risk-adjusted ROI regime. This process is designed to compete aggressively for key opportunities, while also being

very committed to achieving positive results, both in the short and long term for our shareholders.

66.    The statements on January 28, 2025 implied that Lockheed had taken stock of its contracts, especially those in the Aeronautics segment, and corrected its estimates of costs based on existing trends.

67.    However, on July 22, 2025, before the market opened, Lockheed disclosed an additional *$1.6 billion* in pre-tax losses on classified programs. This included a $950 million loss related to its Aeronautics classified program due to "design, integration, and test challenges, as well as other performance issues." According to the press release:

> **Aeronautics Classified Program** – Aeronautics has experienced design, integration, and test challenges, as well as other performance issues on this program. *These trends continued into 2025 and had a greater impact on schedule and costs than previously estimated. As a result, Aeronautics performed a comprehensive review of its program execution and management processes to achieve the technical requirements of the program, which was completed in the second quarter.* Based on this review and ongoing discussions with the customer and suppliers, Aeronautics made significant changes to its processes and testing approach, resulting in significant updates to the program's schedule and cost estimates. As a result, during the second quarter of 2025 the Company recognized additional pretax reach-forward losses of $950 million on the program.

68.    During the related conference call, newly appointed CFO Evan Scott explained that "the process control, and resource changes we implemented following the fourth quarter of 2024, along with additional performance data on the program, resulted in new insights that led us to recognize an incremental $950 million of reach-forward loss the second quarter." Based on a "comprehensive review," Lockheed recognized this charge as "a prudent continuation of the comprehensive corrective actions and risk mitigation approach implemented at the start of the year which continues to demonstrate solid progress."

69.    As a result, the Company reported sharply lower net earnings of $342 million. On this news, the Company's share price fell 10.8% to close at $410.74 per share on July 22, 2025.

16

**D.      The Individual Defendants Personally Benefited From The Misleading Statements**

70.      The Individual Defendants did not merely fail to oversee the Company's business operations and disclosure functions. They personally benefited from the misleading statements through inflated annual cash incentive bonuses, performance stock unit awards, and long-term incentive plan cash awards that were calculated using metrics distorted by the underestimation of costs and, in turn, the deferred recognition of the reach-forward losses described above.

71.      The Compensation Committee designed the executive incentive compensation programs to tie executive pay to the Company's reported financial performance:

a.      The annual cash incentive plan during the relevant period was based 70% on financial goals and 30% on strategic and operational goals assessed by the Compensation Committee. The financial goals were comprised of: Sales (weighted 20% of the financial component), Segment Operating Profit (weighted 40% of the financial component), and Free Cash Flow (weighted 40% of the financial component).

b.      The long-term incentive plan during the relevant period was based 50% on Relative Total Stockholder Return measured against a peer group, 25% on Return on Invested Capital, and 25% on Free Cash Flow.

72.      Reach-forward losses on classified programs reduce Segment Operating Profit and Return on Invested Capital because they are recorded as charges against operating profit and net earnings in the period they are recognized. Reach-forward losses do not reduce Free Cash Flow in the period of recognition because they are non-cash accruals. The deferred recognition of reach-forward losses thus inflated each metric on which executive compensation depended at the time the inflated metrics were used to calculate executive payouts. The longer the reach-forward losses remained undisclosed, the higher the executive payouts.

17

     **1.**     **The Compensation Committee Amended Incentive Plan Awards in February 2023 to Insulate Executive Compensation from Strategic Program Losses**

73.    In February 2023, well before any public disclosure of the classified program losses, the Compensation Committee approved amendments to the Company's outstanding performance stock unit and long-term incentive plan awards that specifically neutralized the impact of those losses on executive compensation.

74.    With respect to the 2021-2023 performance stock unit and long-term incentive plan award cycle, the 2024 Proxy Statement states: "[i]n February 2023, the Compensation Committee approved additional amendments to these awards to ensure neutralization of the impact of changes in tax laws or interpretation of tax laws related to the amortization of R&D expenditures for tax purposes by adjusting net income *and to neutralize the impact of profit changes due to the timing or recognition of a loss on a specific strategic program approved by the Compensation Committee*."

75.    The Compensation Committee approved a substantively identical amendment to the 2022-2024 performance stock unit and long-term incentive plan award cycle. The 2025 Proxy Statement states: "[i]n 2023, the Compensation Committee approved amendments to these awards to ensure neutralization of the impact of changes in tax laws or interpretation of tax laws related to the amortization of R&D expenditures for tax purposes by adjusting net income *and to neutralize the impact of profit changes due to the timing or recognition of a loss on a specific strategic program approved by the Compensation Committee and not related to operational performance*."

76.    Upon information and belief, the "specific strategic program" referenced in these amendments encompasses one or more of the classified programs at the Aeronautics and Missiles and Fire Control segments for which Lockheed eventually disclosed reach-forward losses in

18

October 2024, January 2025, and July 2025. The timing of the amendments (i.e., months before the first partial public disclosure of those losses on October 22, 2024) and the specificity with which the amendments target a single identified "strategic program approved by the Compensation Committee" support the inference that the Compensation Committee adopted the amendments because it knew, or had reason to know, that significant reach-forward losses on the classified program were imminent or under active discussion.

77. The amendments operated as the Compensation Committee intended. For purposes of calculating the 2024 annual incentive plan payouts, the Compensation Committee added back $768 million to Segment Operating Profit "for the timing of recognition of a loss on a strategic program," increasing the Segment Operating Profit metric used to determine executive compensation from $6,083 million to $6,851 million.

78. For purposes of calculating the 2022-2024 long-term incentive plan and performance stock unit award payouts, the Compensation Committee adjusted net earnings and equity by $570 million "for the timing of the recognition of a loss on a specific strategic program," thereby increasing the Return on Invested Capital metric used to determine executive compensation.

79. For purposes of calculating the 2023-2025 long-term incentive plan and performance stock unit award payouts, the Compensation Committee again applied an adjustment to Return on Invested Capital that neutralized, among other things, "a prior year loss on a specific strategic program."

80. The amendments and corresponding adjustments were not designed to incentivize performance. They were targeted protections approved by the Compensation Committee in advance of foreseeable financial consequences from a known strategic program risk that operated

19

to insulate the Individual Defendants from the losses that this action seeks to remedy. By approving the amendments while continuing to permit the Company to make the misleading statements described above, the members of the Compensation Committee, defendants Donovan, Falk, Gordon, Hollub, Reed-Klages, Yarrington, and Burritt, abandoned their fiduciary duties of loyalty and good faith.

> **2.      The Individual Defendants Received Inflated Annual Cash Incentive Bonuses for Fiscal Year 2023**

81.      For fiscal year 2023, the Compensation Committee certified an Overall Payout Factor of 126% of target on the annual cash incentive plan. The Financial Payout Factor was 116% as reflected below:

| 2023 Financial Measures | Weight | 2023 Goals ($) | Results ($) | Calculated Payout | Weighted Payout |
|---|---|---|---|---|---|
| Sales | 20% | 65,250M | 67,571M | 159.3% | 32% |
| Segment Operating Profit* | 40% | 7,305M | 7,358M** | 107.3% | 43% |
| Free Cash Flow* | 40% | 6,200M | 6,229M | 101.9% | 41% |
| **Financial Payout Factor** | | | | | **116 %** |

82.      Defendant Taiclet received an annual cash incentive payout of $4,191,900 for 2023. Defendant Malave received $1,434,500. Frank A. St. John, Lockheed's Chief Operating Officer ("COO"), received $1,946,700. Other named executive officers received approximately $1,441,800 each.

83.      Had the reach-forward losses been recognized in 2023 when the Individual Defendants had reason to know that the estimated costs exceeded the transaction price for the classified program (as eventually disclosed in 2024 and 2025), Segment Operating Profit for 2023 would have been materially lower than the $7,358 million figure used to calculate executive compensation. As a result, the Financial Payout Factor would have been below target, and the Overall Payout Factor would have been substantially lower. The 2023 annual cash incentive

20

bonuses paid to the Individual Defendants would have been materially smaller than the amounts actually paid. The Individual Defendants thus personally benefited from the deferred recognition of those losses through inflated 2023 annual incentive payouts.

### 3. The Individual Defendants' Bonuses for 2024 and 2025 Were Inflated by the Compensation Committee's Adjustments to the Underlying Metrics

84.     For fiscal year 2024, the Compensation Committee certified an Overall Payout Factor of 89% of target on the annual cash incentive plan. The Financial Payout Factor was 67%, as reflected below:

| 2024 Financial Measures | Weight | 2024 Goals ($) | Results ($) | Calculated Payout | Weighted Payout |
|---|---|---|---|---|---|
| Sales | 20% | 69,250M | 71,043M | 143 % | 29 % |
| Segment Operating Profit* | 40% | 7,340M | 6,851M ** | 0 % | 0 % |
| Free Cash Flow* | 40% | 6,300M | 6,253M *** | 96 % | 38 % |
| **Financial Payout Factor** | | | | | **67 %** |

The Segment Operating Profit result of $6,851 million included the $768 million adjustment alleged above, and the Free Cash Flow metric included a $966 million adjustment for unplanned pension contributions.

85.     Defendant Taiclet received an annual cash incentive payout of $2,960,900 for 2024. Defendant Malave received $1,089,400. The COO received $1,375,100, and other named executive officers received approximately $1,062,700 each.

86.     For fiscal year 2025, even after Lockheed recognized an additional approximately $1.6 billion in reach-forward losses on classified programs in the second quarter of 2025, the Compensation Committee certified an Overall Payout Factor of 114% of target on the annual cash incentive plan, higher than the 89% certified for 2024. The Financial Payout Factor was 102.4%, as reflected below:

21



| Measure | Weight | Threshold (50% Payout) | Target (100% Payout) | Maximum (200% Payout) | Calculated Payout | Weighted Payout |
|---|---|---|---|---|---|---|
| Sales | 20% | | $75,048M / $74,500M | | 112.2% | 22.4% |
| Seg. Operating Profit* | 40% | $6,743M | $8,200M | | 0.0% | 0.0% |
| Free Cash Flow* | 40% | | $6,600M | $7,704M** | 200% | 80% |
| | | | | Overall Financial Payout Factor | | 102.4% |

The Free Cash Flow metric paid out at the maximum permissible amount under the plan.

87.     Defendant Taiclet received an annual cash incentive payout of $3,992,300 for 2025, higher than his 2024 payout of $2,960,900, despite Lockheed having recognized an additional $1.6 billion in reach-forward losses on classified programs during 2025.

88.     By heavily weighing Free Cash Flow (40% of the financial component; 28% of the total payout factor) and its own discretionary assessment of strategic and operational performance (30% of the total payout factor), as well as its adjustments to Segment Operating Profit described above, the Compensation Committee ensured that the Individual Defendants would continue to receive substantial annual cash bonuses even as the Company recognized billions of dollars in reach-forward losses on classified programs that the Individual Defendants were responsible for managing and disclosing.

### 4.     The Individual Defendants Received Inflated Awards

89.      The 2022-2024 performance stock unit and long-term incentive plan award cycle, with a three-year measurement period running from January 1, 2022 through December 31, 2024, paid out at an Overall Payout Factor of 120.2% of target. The Relative Total Stockholder Return

measure paid out at 164.3%, a weighted contribution of 82.1%; the Free Cash Flow measure at 101.5%, a weighted contribution of 25.4%; and the Return on Invested Capital measure at 50.7%, a weighted contribution of 12.7%.

90.     The above-target Relative Total Stockholder Return payout was driven by the price of Lockheed common stock during the 2022-2024 measurement period. As alleged herein, the Company's public statements during that period concealed the reach-forward losses on classified programs and thereby maintained Lockheed's stock price at artificially inflated levels. Had those losses been recognized as they accrued during 2022, 2023, and the first three quarters of 2024, the Company's stock price would have been materially lower throughout the measurement period, the Relative Total Stockholder Return percentile rank would have been lower, and the Total Stockholder Return Payout Factor would have been below 164.3%.

91.     The Return on Invested Capital component of the 2022-2024 cycle was inflated for compensation purposes by the Compensation Committee's adjustment of net earnings by $570 million "for the timing of the recognition of a loss on a specific strategic program," as alleged above. Without that adjustment, the Return on Invested Capital used to determine executive compensation would have been lower, the Return on Invested Capital Payout Factor would have been below 50.7%, and the Overall Payout Factor for the cycle would have been below 120.2%.

92.     The 2022-2024 cycle paid defendant Taiclet $3,606,000 in long-term incentive plan cash compensation and 23,182 shares of Lockheed common stock distributed on or about February 23, 2025 (against a target of 19,286 shares). Defendant Malave received $1,923,200 in long-term incentive plan cash compensation and 12,364 shares (against a target of 10,286 shares). The Chief Operating Officer received $1,442,400 and 9,274 shares (against a target of 7,715). The other named executive officers received corresponding above-target payouts.

23

93.     The 2023-2025 performance stock unit and long-term incentive plan award cycle, with a three-year measurement period running from January 1, 2023 through December 31, 2025, paid out at an Overall Payout Factor of 47.0%. The Relative Total Stockholder Return measure paid 0%, reflecting the share price decline that followed the disclosure of the reach-forward losses. Notwithstanding that result, the Compensation Committee approved an adjustment to the Return on Invested Capital metric for this cycle that neutralized, among other things, "a prior year loss on a specific strategic program," thereby increasing executive compensation by adjusting away the impact of the very reach-forward losses at issue.

94.     The 2023-2025 cycle paid defendant Taiclet $1,504,000 in long-term incentive plan cash compensation and 7,842 shares of Lockheed common stock. The Chief Operating Officer received $587,500 and 3,063 shares. Other named executive officers received corresponding payouts.

### 5.     The Officer Defendants Received Enormous Windfalls

95.      As a result of the misleading statements and the Compensation Committee's actions described above, defendant Taiclet received total compensation of $22,813,775 for fiscal year 2023, $23,753,914 for fiscal year 2024, and $23,453,308 for fiscal year 2025: aggregate compensation of approximately $70.0 million across the three fiscal years during the misleading statements.

96.     Defendant Malave received total compensation of $6,659,256 for fiscal year 2023 and $8,532,614 for fiscal year 2024. The increase in total compensation from 2023 to 2024 was driven principally by an increased stock award and the long-term incentive plan cash payout for the 2022-2024 cycle, which paid out at 120.2% of target by virtue of the Compensation Committee adjustments described above.

24

97.     These payouts to the officer defendants were inflated by, and are properly attributable to, the misconduct alleged in this Complaint. The February 2023 amendments specifically protected those payouts from being reduced by the recognition of reach-forward losses on classified programs that the Compensation Committee knew or had reason to know were imminent. The Individual Defendants thus received improper benefits in annual cash incentive bonuses, long-term incentive plan cash payouts, and performance stock units delivered at above-target levels as a direct result of the misconduct alleged herein.

**E.     The Individual Defendants Caused Lockheed To Repurchase Its Common Stock At Inflated Prices During The Wrongdoing**

98.      While the Individual Defendants were issuing the misleading statements, they simultaneously caused Lockheed to repurchase approximately $4.95 billion of its own common stock, funded with cash on hand and the proceeds of senior unsecured note issuances, at average prices that were materially inflated by the misleading statements. The repurchases were authorized and overseen by the Board, including an October 2024 Board action that expanded the share repurchase authorization by $3.0 billion contemporaneously with the Company's first partial disclosure of reach-forward losses on classified programs.

99.     Lockheed's share repurchase program was originally approved by the Board in October 2010. Under the program, management has discretion, subject to Board oversight, to determine the dollar amount of shares to be repurchased and the timing of any repurchases. From time to time, the Board authorizes increases to the program. Repurchases may be made through privately negotiated transactions, open market purchases, accelerated share repurchase agreements, or pursuant to Rule 10b5-1 plans.

**1.     The October 2023 Authorization Increase and the 2023 Buybacks at Inflated Prices**

25

100.    On October 6, 2023, the Board of Directors authorized an increase of $6.0 billion to the share repurchase program. As of December 31, 2023, the total remaining authorization for future common share repurchases under the program was $10.0 billion.

101.    During 2023, Lockheed repurchased 13.4 million shares of its common stock for $6.0 billion pursuant to accelerated share repurchase agreements and open market purchases, an average price of approximately $447 per share. Lockheed also retired an additional 1.5 million shares received for no additional consideration in the first quarter of 2023 upon final settlement of an accelerated share repurchase agreement executed in the fourth quarter of 2022.

102.    During the fourth quarter of 2023, Lockheed repurchased 6,715,890 shares of its common stock at an average price of $447.18 per share, as follows:

| Period | Number of Shares | Average Price | Total Cost |
|---|---|---|---|
| September 25 – October 29, 2023 | 1,265,110 | $446.24 | $564,542,686.40 |
| October 30 – November 26, 2023 | 2,775,003 | $447.82 | $1,242,701,843.46 |
| November 27 – December 31, 2023 | 2,675,777 | $446.97 | $1,195,992,045.69 |
| **Totals** | **6,715,890** | | **$3,003,236,575.55** |

**2.    The 2024 Buybacks Were Made at Prices Inflated by the Misleading Statements**

103.    During 2024, Lockheed paid $3.7 billion to repurchase 7.5 million shares of its common stock, an average price of approximately $493 per share. These repurchases occurred while the Individual Defendants were issuing misleading statements, and at prices that exceeded the stock's value as it would have been absent those misleading statements.

104.    Throughout the first three quarters of 2024, during which the Individual Defendants made repeated public representations that Lockheed had abandoned "must-win" pricing strategies, was "matching the pricing and the risk profile," and was monitoring the classified Aeronautics

program closely, Lockheed continued repurchasing common stock at prices in or near the all-time highs for the stock. Free cash flow generated by the Company while reach-forward losses were not being recognized was deployed to repurchase common stock at those inflated prices.

105.   On information and belief, by no later than the second quarter of 2024, the Individual Defendants knew or were reckless in not knowing that significant reach-forward losses on the classified Missiles and Fire Control program were imminent. Indeed, in the first quarter of 2024, Lockheed had already concluded that exercise of the first option under that program was probable and recognized a reach-forward loss of approximately $100 million. The Individual Defendants nevertheless continued to cause the Company to repurchase its stock at peak prices throughout the period.

**3.    The Board Expanded the Share Repurchase Program by $3.0 Billion in October 2024 Contemporaneously with the First Partial Disclosure of Classified Program Losses**

106.   On October 22, 2024, before the market opened, Lockheed announced its first partial disclosure of reach-forward losses on classified programs, $80 million in losses for a classified Aeronautics program "due to higher than anticipated costs to achieve program objectives," together with a separate reach-forward loss in the rotary and mission systems segment "as a result of additional quantity ordering risk identified on fixed-price options." As alleged above, that disclosure was misleading because it implied that the losses had been largely contained. The same month, the Board of Directors authorized an increase of $3.0 billion to the share repurchase program. The Board simultaneously authorized a fourth quarter dividend payment of $3.30 per share, representing an increase of $0.15 per share over the prior quarterly dividend payment. As of December 31, 2024, the remaining authorization under the program was $9.3 billion.

107.   By expanding the share repurchase program by $3.0 billion contemporaneously with the partial disclosure of the classified program losses, the Board signaled to the market that it was confident in the Company's financial outlook and that the disclosed losses were limited and contained. The market understood the buyback expansion as a confirmation of management's representations that, in defendant Taiclet's words, the Company's risk-adjusted bid process was "designed to compete aggressively for key opportunities, while also being very committed to achieving positive results, both in the short and long term for our shareholders." That statement was misleading because, as subsequently disclosed in January 2025 and July 2025, additional reach-forward losses of approximately $1.7 billion and $1.6 billion respectively were recorded.

108.   The Board's expansion of the share repurchase program by $3.0 billion in October 2024 was an authorization to deploy substantial corporate cash to acquire Lockheed common stock at prices the Board members knew or were reckless in not knowing were materially inflated by the misleading statements then being made and maintained.

### 4.   After the October 22, 2024 Partial Disclosure, Lockheed Continued To Repurchase Common Stock at Prices Above $530 per Share

109.   During the fourth quarter of 2024, Lockheed repurchased 1,879,577 shares of its common stock at an average price of $534.67 per share for a total of approximately $1.0 billion, as set forth below:

| Period | Number of Shares | Average Price | Total Cost |
|---|---|---|---|
| September 30 – October 27, 2024 | 93,965 | $566.77 | $53,256,543.05 |
| October 28 – November 24, 2024 | 990,487 | $546.85 | $541,647,815.95 |
| November 25 – December 31, 2024 | 795,125 | $515.71 | $410,053,913.75 |
| **Totals** | **1,879,577** | | **$1,004,958,272.75** |

The sales made after the October 22, 2024 disclosure exceeded $950 million.

28

110.    By making more than $950 million of share repurchases at average prices above $530 per share at a time when the Individual Defendants knew or were reckless in not knowing that the October 22 partial disclosure had failed to communicate the magnitude of the reach-forward losses on classified programs, the Board caused Lockheed to acquire its own stock at prices materially above the price the stock would have commanded had complete disclosures been made. After the January 28, 2025 disclosure of $1.7 billion in additional reach-forward losses, Lockheed common stock closed at $457.45 per share, approximately $77 below the average price paid for the post-October-22 repurchases described in this paragraph.

### 5.    Lockheed Continued Repurchasing Stock at Inflated Prices Through Q2 2025,  the Quarter in Which the Additional $1.6 Billion Reach-Forward Losses Were Recognized

111.    During the first quarter of 2025, Lockheed repurchased 1.7 million shares of its common stock for $750 million, an average price of approximately $441 per share, at the time the Individual Defendants represented at the January 28, 2025 earnings call that Lockheed had "performed a comprehensive review of the program requirements, technical complexities, schedule, and risks" and had "de-risk[ed] the financial profile of both these critical national security programs going forward."

112.    During the second quarter of 2025, the quarter in which Lockheed performed the "comprehensive review of its program execution and management processes" that resulted in the recognition of an additional $950 million reach-forward loss on the classified Aeronautics program, Lockheed repurchased 1,067,119 shares of its common stock at an average price of $468.58 per share, totaling approximately $500 million.

113.    On July 22, 2025, the day Lockheed disclosed the additional $1.6 billion in reach-forward losses, the Company's stock closed at $410.74 per share, approximately $58 below the average price paid for the second-quarter 2025 repurchases.

**6.    The Buybacks Inflated Per-Share Metrics on Which Executive Compensation Depended**

114.    The Compensation Committee's compensation programs are sensitive to per-share metrics. The 2024-2026 long-term incentive plan and performance stock unit awards measure performance based in part on Return on Invested Capital, calculated as net earnings plus after-tax interest expense divided by average invested capital, where average invested capital includes total equity. Share repurchases reduce stockholders' equity in the Company's balance sheet and thereby reduce the denominator of the Return on Invested Capital calculation. Holding net earnings constant, fewer shares outstanding produces a higher Return on Invested Capital and a higher payout under the performance stock unit and long-term incentive plan awards.

115.    By repurchasing approximately $4.95 billion of common stock during the period of the misleading statements, Lockheed reduced its outstanding share count by approximately 9.2 million shares (out of approximately 240 million shares outstanding at the start of the period). The reduction in share count inflated Earnings Per Share, the Total Stockholder Return component used in the Compensation Committee's long-term incentive plan calculation, and other per-share metrics. The benefits of those buybacks accrued disproportionately to the Individual Defendants whose compensation was tied to those metrics, including defendant Taiclet, defendant Malave, and the other named executive officers identified above.

116.    In the same period, Lockheed issued senior unsecured notes to fund a portion of the share repurchase program, including net proceeds of $3.0 billion received in 2024 from the issuance of senior unsecured notes. By using debt financing to repurchase common stock at prices the Individual Defendants knew or were reckless in not knowing were materially inflated, the Individual Defendants further leveraged the Company's balance sheet at the height of the misleading statements.

### 7.   Damages Caused by the Buybacks

117.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary duties of candor and good faith, Lockheed paid materially more for its repurchased common stock than it would have paid had complete disclosures been made. Using the post-disclosure closing price of $410.74 on July 22, 2025 as a comparator, Lockheed's full-year 2024 buybacks at an average price of approximately $493 per share resulted in approximately $620 million of overpayment for the 7.5 million shares repurchased during 2024. The fourth-quarter 2024 buybacks alone, at an average price of $534.67 per share, resulted in approximately $233 million of overpayment for the 1.88 million shares repurchased during that quarter.

118.   The Board members who authorized and oversaw the share repurchase program during the relevant period, including the October 2024 expansion of the program by $3.0 billion contemporaneous with the partial disclosure, bear personal responsibility for the resulting harm to Lockheed.

### 8.   Additional Scienter Allegations

119.   Defendants, as described herein, acted with scienter, meaning they knowingly or recklessly disregarded that the public statements and documents they issued and disseminated as alleged herein, either in the name of Lockheed or in their own names, were materially false and misleading. Defendants knowingly and substantially contributed to or approved the issuance or dissemination of those statements and documents and authorized the Company's repurchase of its own common stock at prices artificially inflated by those statements, constituting primary violations of the federal securities laws. By receiving information reflecting the true facts about the financial risks of Lockheed's classified Aeronautics and Missiles and Fire Control programs and the F-35 program, and by controlling, receiving, and modifying Lockheed's materially false

31

and misleading statements, the Individual Defendants were active and culpable participants in the alleged fraudulent scheme.

120.   Due to their positions at the most senior levels of Lockheed, the Individual Defendants, and in particular defendants Taiclet and Malave, controlled the content of the Company's public statements during the wrongdoing and were responsible for the accuracy of Lockheed's reported segment financial results and the timely recognition of reach-forward losses. Each Individual Defendant either received or had access to the information alleged herein to be false and misleading prior to or shortly after its release, and had the ability and opportunity to prevent its dissemination or ensure its correction. By virtue of their positions and access to material non-public information, the Individual Defendants knew, or recklessly disregarded, that the adverse facts alleged herein were not disclosed and were actively concealed from the public while the positive representations being made were materially false and misleading.

121.   First, defendants' own admissions support a strong inference of scienter. On July 22, 2025, in connection with the announcement of an additional $950 million reach-forward loss on the classified Aeronautics program, defendants admitted that Aeronautics had performed "a comprehensive review of its design, integration, test, and other processes to achieve the technical requirements of the program" and had made "significant changes to its processes and testing approach." Defendants' belated implementation of these remedial measures constitutes an admission that the risk-identification, monitoring, and disclosure processes in place during the misleading statements, the period during which Lockheed repurchased its own common stock at inflated prices, were materially inadequate. By publicly characterizing these reforms as necessary to achieve the program's technical requirements, defendants implicitly conceded that Lockheed

previously lacked the systems and controls required to timely identify, quantify, and respond to the cost risks on the classified programs.

122. Second, the timing and circumstances of defendant Malave's departure further support an inference of scienter. On April 17, 2025, three months before the July 22, 2025 disclosure of the additional $1.6 billion in reach-forward losses, and weeks after defendant Malave publicly assured investors that Lockheed's losses on the classified programs were "well-contained," he advised the Company of his intention to pursue opportunities outside of Lockheed. Defendant Malave's resignation came directly before defendants' admission that Lockheed required significant improvements to its cost analysis and risk management procedures. The proximity of defendant Malave's departure to the additional reach-forward loss disclosure and the implementation of remedial measures supports a strong inference that defendant Malave acted knowingly or with severe recklessness.

123. Third, the classified Aeronautics and Missiles and Fire Control programs and the F-35 program were core to Lockheed's business at all relevant times. The F-35 program accounted for approximately 26% of Lockheed's consolidated revenues, the Company's single largest program, and the Aeronautics and Missiles and Fire Control segments together accounted for the majority of Lockheed's net sales. Defendant Malave himself described the classified programs as "growth engine[s]" for Lockheed. Given the scale, revenue concentration, and strategic importance of these programs to Lockheed's business, it is implausible that the Individual Defendants were unaware of the adverse facts concealed or misrepresented during the misleading statements.

124. Fourth, defendants' own statements demonstrate their detailed knowledge of, and represented visibility into, the classified programs. Defendant Taiclet represented that Lockheed had abandoned "must-win" pricing and was "matching the pricing and the risk profile" of its

contracts. Defendant Malave represented that the classified Aeronautics program was "always a watch item for us" and that defendants "continue[d] to monitor that one pretty closely." On October 22, 2024, defendant Malave provided precise figures for expected 2025 losses on the classified Missiles and Fire Control program "anywhere between, say, $250 million to $300 million in losses in 2025," only to disclose just three months later that Lockheed had recognized $1.3 billion in additional losses on that program. The precision of these representations is inconsistent with defendants having lacked knowledge of the true cost trajectories on the classified programs.

125. Fifth, defendants' authorization and oversight of Lockheed's repurchases of its own common stock further supports a strong inference of scienter. As alleged above, Lockheed repurchased approximately $4.95 billion of its own common stock at average prices materially above the post-disclosure share price. In October 2024, the same month as the first partial disclosure of reach-forward losses on classified programs, the Board authorized an expansion of the share repurchase program by $3.0 billion, and in the weeks that followed Lockheed repurchased approximately $980 million of common stock at average prices above $530 per share. Defendants' decision to deploy substantial corporate cash to acquire Lockheed common stock at peak prices while at the same time making and maintaining materially misleading public statements about the financial risks of the classified programs supports a strong inference that defendants acted knowingly or with severe recklessness.

126. Considered holistically, defendants' admissions regarding the inadequacy of risk-identification and management processes that were corrected only after the disclosures; the timing and circumstances of defendant Malave's departure; the critical importance of the affected programs to Lockheed's business; defendants' detailed and confident statements regarding their

34

monitoring of those programs; and defendants' contemporaneous authorization of Lockheed's repurchase of its own common stock at inflated prices — the totality of the circumstances supports a strong inference that defendants acted with scienter under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder.

## VI.   DAMAGES TO THE COMPANY

127.   As a direct and proximate result of the Individual Defendants' conduct, Lockheed has been seriously harmed and will continue to be.  Such harm includes, but is not limited to:

(a)   Funds expended to repurchase Company stock at artificially inflated prices;

(b)   Excess compensation to officer defendants as a result of the repurchases and artificial inflation of Lockheed stock;

(c)   Legal fees incurred in connection with the Securities Class Action;

(d)   Any funds paid to settle the Securities Class Action; and

(e)   Costs incurred from compensation and benefits paid to defendants who have breached their duties to Lockheed.

128.   In addition, Lockheed's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired.  The Company still has not fully admitted to the nature of its false statements and the true condition of its business.  The credibility and motives of management are now in serious doubt.

129.   The actions complained of herein have irreparably damaged Lockheed's corporate image and goodwill.  For at least the foreseeable future, Lockheed will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Lockheed's ability to raise equity capital or debt on favorable terms in the future is now impaired.

35

## VII.   DERIVATIVE AND DEMAND ALLEGATIONS

130.   Plaintiff brings this action derivatively in the right and for the benefit of Lockheed to redress injuries suffered, and to be suffered, by Lockheed as a direct result of the wrongdoing alleged herein.  Lockheed is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

131.   Plaintiff will adequately and fairly represent the interests of Lockheed in enforcing and prosecuting its rights.

132.   Plaintiff has continuously been a shareholder of Lockheed at times relevant to the wrongdoing complained of and is a current Lockheed shareholder.

133.   On December 3, 2025, Plaintiff made a demand on the Board to investigate and remedy the violations of law described herein as required by Maryland law. *See* Exhibit 1 (the "Demand"). The Demand alleges that, as detailed above, Lockheed's risk controls and procedures were inadequate and that its public disclosures with respect to risk management and financial risk were misleading.

134.   On December 15, 2025, the Company's counsel responded to the Demand, stating that the Demand has been referred to the Board and will be considered in due course.

135.   Nearly five months have passed, and the Board has not responded to the demand.

136.   The Company's lack of response does not comport with Maryland law. *See Shenker v. Laureate Educ., Inc.*, 411 Md. 317, 344 (Md. 2009) ("Once demand is made, the corporation's board of directors ***must conduct an investigation into the allegations*** in the demand and determine whether pursuing the demanded litigation is in the best interests of the corporation.").

137.   The Board did not delegate an investigation to a special committee of directors, engage legal and/or financial experts, or issue a determination as to whether the Individual Defendants and/or the any demand review Committee and/or the Audit Committee exercised their

36

fiduciary duties. These failures are not a proper exercise of business judgment, thus the Demand was wrongfully refused.

## COUNT I

### Against All Defendants for Breach of Fiduciary Duty

138.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

139.    Each Individual Defendant owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Lockheed's business and affairs, particularly with respect to issues as fundamental as public disclosures and risk oversight as to the Company's defense contracts with the government.

140.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Lockheed.

141.    In breach of their fiduciary duties owed to Lockheed, the Individual Defendants willfully participated in and caused the Company to expend unnecessarily its corporate funds, rendering them personally liable to the Company for breaching their fiduciary duties.

142.    In particular, the Individual Defendants knowingly or recklessly made untrue statements and/or permitted the Company's public filings, disclosures, and statements to misleadingly report financial risks and the Company's overall prospects.

143.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Lockheed has sustained and continues to sustain significant damages, including direct monetary damages, exposure to liability from securities litigation and a loss of

37

goodwill in the capital markets.  As a result of the misconduct alleged herein, defendants are liable to the Company.

## COUNT II

### Against Defendants Taiclet and Malave for Unjust Enrichment

144.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

145.     By their wrongful acts, Taiclet and Malave were unjustly enriched at the expense of and to the detriment of the Company.  Taiclet and Malave were unjustly enriched as a result of the compensation paid to them without basis and while they were breaching fiduciary duties owed to the Company.

146.     Plaintiff, as a stockholder and representative of the Company, seeks restitution from Taiclet and Malave and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by Taiclet and Malave from their wrongful conduct and fiduciary breaches.

147.     Plaintiff has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934

148.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

149.     The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding the Company. Not only is the Company now defending claims that it violated Section10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself, due to the Individual Defendants' acts, was one of the largest victims of the unlawful scheme perpetrated on investors by the Individual Defendants. With the price of its

common stock trading at artificially-inflated prices due to the Individual Defendants' material misrepresentations, the Individual Defendants caused the Company to repurchase approximately 9.38 million of its own shares on the open market at artificially-inflated prices, damaging the Company by millions of dollars.

150. The Individual Defendants individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

151. The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about the Company not misleading.

152. The Individual Defendants acted with scienter in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were senior executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

153. In addition to each of the Individual Defendants approving the issuance of the Company's false and misleading statements while they were serving as a senior executive or

director of the Company, as members of the Board, each of the Individual Defendants then serving as a director made and/or signed the Company's Forms 10-K and Forms 10-Qfiled with the SEC as alleged herein.

154.    By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

155.    Plaintiffs on behalf of the Company have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of Lockheed, demands judgment as follows:

A.      Declaring that Plaintiff may maintain this action on behalf of Lockheed and that Plaintiff is an adequate representative of the Company;

B.      Declaring that Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Lockheed;

C.      Against all of the Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

D.      Directing Lockheed to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Lockheed and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1. a proposal to strengthen the Company's controls over financial reporting;

2.  a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

3.  a proposal to strengthen Lockheed's oversight of its disclosure procedures; and

4.  a provision to permit the stockholders of Lockheed to nominate at least three candidates for election to the Board.

E.    Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that Plaintiff on behalf of Lockheed has an effective remedy;

F.    Awarding to Lockheed restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

G.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

H.    Granting such other and further relief as the Court deems just and proper.

## VIII.  JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  May 18, 2026

*/s/ William E. Jacobs*
**Weisbrod Matteis & Copley PLLC**
Stephen A. Weisbrod (# 14795)
William E. Jacobs (# 21975)
3000 K Street NW, Suite 275
Washington, DC 20007
Telephone (202) 499-7900
sweisbrod@wmclaw.com
wjacobs@wmclaw.com

41

**GLANCY PRONGAY WOLKE & ROTTER LLP**
Benjamin I. Sachs-Michaels (*pro hac vice* to be filed)
745 Fifth Avenue, Fifth Floor
New York, New York 10151
Telephone: (212) 935-7400
bsachsmichaels@glancylaw.com

Robert V. Prongay (*pro hac vice* to be filed)
Pavithra Rajesh (*pro hac vice* to be filed)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
rprongay@glancylaw.com
prajesh@glancylaw.com

**LAW OFFICE OF ALFRED G. YATES, JR., P.C.**
Alfred G. Yates, Jr. (*pro hac vice* to be filed)
1575 McFarland Road, Suite 305
Pittsburgh, PA 15216
Phone: (412) 391-5164
Fax: (412) 471-1033

*Counsel for Plaintiff Robert Reese*

42